691 F.2d 1054
 29 Fair Empl.Prac.Cas. 1599,
30 Empl. Prac. Dec. P 33,072, 7 Ed. Law Rep. 269,
3 Employee Benefits Ca 2009
 Diana SPIRT, Plaintiff-Appellant-Cross-Appellee,
and
Equal Employment Opportunity Commission, and American
Association of University Professors, Intervenors-Appellees,
v.
TEACHERS INSURANCE AND ANNUITY ASSOCIATION, College
Retirement Equities Fund, Long Island University,
and Albert B. Lewis,
Defendants-Cross-Appellants-Appellees.
 Nos. 1375, 1376 and 1377, Dockets 79-7715, 79-7737 and 79-7739.
 United States Court of Appeals,
Second Circuit.
 Argued June 18, 1982.
Decided Sept. 29, 1982.
 
 Kenneth D. Wallace, New York City, for plaintiff-appellant-cross-appellee.
 William R. Glendon, New York City (Rogers & Wells, James B. Weidner, James W. Paul, Joseph A. Post, New York City, of counsel), for defendants-cross-appellants-appellees Teachers Ins. and Annuity Ass'n and College Retirement Equities Fund.
 James Kearney, New York City (Webster & Sheffield, Donald J. Cohn, Miriam Lane Sparrow, New York City, Judith E. Tytel, Gen. Counsel, Long Island University, Greenvale, N. Y., of counsel), for defendant-appellee-cross-appellant Long Island University.
 Neal Johnston, Asst. Atty. Gen., New York City (Robert Abrams, Atty. Gen. of N. Y., Robert S. Hammer, Asst. Atty. Gen., New York City, of counsel), for appellee Albert B. Lewis.
 William H. Ng, Atty., Washington, D. C. (Michael J. Connolly, Gen. Counsel, Philip B. Sklover, Associate Gen. Counsel, Vella M. Fink, Asst. Gen. Counsel, Washington, D. C., of counsel), for intervenor-appellee E. E. O. C.
 John L. Pottenger, Jr., New Haven, Conn. (David M. Rabban, Washington, D. C., of counsel), for intervenor-appellee American Ass'n of University Professors.
 Mary L. Heen, Isabelle Katz Pinzler, New York City, for American Civil Liberties Union Women's Rights Project and New York Civil Liberties Union as amici curiae.
 Before NEWMAN and PIERCE, Circuit Judges, and CANNELLA, Senior District Judge.*
 PIERCE, Circuit Judge:
 
 
 1
 It is plaintiff's claim, in this action which was filed in the United States District Court for the Southern District of New York more than eight years ago, that defendants Teachers Insurance and Annuity Association ("TIAA") and College Retirement Equities Fund ("CREF") have violated the equal employment provisions of the Civil Rights Act of 1964, 42 U.S.C. Sec. 2000e et seq. ("Title VII"), by using sex-based mortality tables to calculate the benefits to which pension plan participants, including plaintiff, are entitled upon retirement. As a result of the use of such tables female retirees, who made contributions equal to those of similarly-situated males, receive a smaller monthly retirement benefit than do such male retirees. The district judge found that defendants' use of sex-based mortality tables violated Title VII, and granted summary judgment on this issue. He went on to hold, however, that TIAA--but not CREF--was exempted from compliance with Title VII by virtue of the McCarran-Ferguson Act, 15 U.S.C. Sec. 1011 et seq. Therefore, the district court enjoined CREF--but not TIAA--from using sex-based mortality tables to calculate the number of annuity units to which a retiree is entitled upon retirement on or after May 1, 1980, and enjoined Long Island University ("LIU"), plaintiff's employer, from either making contributions on behalf of its employees, or requiring its employees to contribute, to any retirement plan continuing to use sex-based mortality tables to calculate periodic benefits after June 1, 1980.
 
 
 2
 Plaintiff also claimed below that TIAA and CREF's methods of calculating retirement benefits violated the equal pay provisions of the Fair Labor Standards Act of 1964, 29 U.S.C. Sec. 206(d), and infringed her right to equal protection of the laws in violation of 42 U.S.C. Secs. 1983 and 1985. Finding no state action, the district judge granted defendants TIAA-CREF's motion for summary judgment on the Secs. 1983 and 1985 claims. Plaintiff's equal pay claims apparently were not the subject of motions for summary judgment below, and were not dealt with by the district court.
 
 
 3
 Defendants TIAA-CREF and plaintiff have appealed virtually every final order of the district court pursuant to 28 U.S.C. Sec. 1291.
 
 
 4
 We affirm in part and reverse in part, 475 F.Supp. 1298.
 
 I. Facts
 
 5
 Plaintiff Diana L. Spirt is a tenured professor at Long Island University. LIU has adopted a retirement program managed by TIAA and CREF for its tenured professors and certain other employees. Participation in this program is mandatory for most eligible employees, including plaintiff.
 
 
 6
 TIAA and CREF manage retirement plans for faculty and staff members at 85% of all private four-year colleges and universities and over 40% of all public colleges and universities in the United States. More than 400,000 employees at approximately 2800 colleges and universities participate in the TIAA-CREF system. TIAA is a non-profit, legal reserve life insurance company which was organized in 1918 by the Carnegie Foundation for the Advancement of Teaching. It is " 'an educational service organization [providing] insurance annuities especially designed for employees of educational institutions in the United States and Canada.' " Peters v. Wayne State University, 476 F.Supp. 1343, 1346 (E.D.Mich.1979).
 
 
 7
 In 1952, TIAA's companion organization, CREF, was created in order to allow the investment of pension funds in financial instruments other than those traditionally permissible for annuity funds like TIAA. It, like TIAA, is a non-profit corporation, created by special act of the New York State Legislature.
 
 
 8
 Under the LIU retirement plan the employee and the university each contributes 5% of the first $4800 of an employee's yearly earnings to the pension fund. In addition, LIU contributes 11% of all earnings in excess of $4800, while the employee contributes 5% of all such earnings. Employees may also make voluntary additional payments into their pension fund accounts, on either a regular or an occasional basis. After receipt by TIAA-CREF, all contributions, plus minimum interest and dividends thereon, are immediately credited to individual employees' accounts as they accumulate. Pursuant to contract, all accumulated benefits are fully vested and fully "portable" at all times. Thus each employee has an immediate property interest in the benefits that accrue by virtue of the contributions made on the employee's behalf. In addition, each employee retains this ownership right if and when that employee moves on to other employment, either inside or outside the field of higher education. If a plan participant moves to another university that has adopted a TIAA-CREF retirement program for its employees, the new employer will pay its own pension contributions and those which it withholds from the employee's salary into the employee's existing account. If a plan participant obtains employment in a different field or at a teaching institution that does not use TIAA-CREF to provide its retirement program, that participant can nevertheless make additional contributions to the TIAA-CREF account on either a regular or occasional basis. Even if the employee fails to make such contributions, the participant will retain the right to receive, upon retirement, the benefits to which the participant is entitled by virtue of the contributions that were accumulated on his or her behalf. If a plan participant dies before retirement, the funds accumulated in the account are paid to a designated beneficiary as a death benefit.
 
 
 9
 After retirement, TIAA provides a life-long fixed dollar annuity, which pays the retired plan participant a specified and definite amount of benefit on a monthly basis.[1] CREF, on the other hand, provides its annuitants with a variable annuity. Under this plan the annuitant receives a periodic payment, the amount of which reflects the results of CREF's investment policies. Plan participants may allocate their contributions between TIAA and CREF in whatever proportions they choose, and under certain conditions, they may transfer contributions from one system to the other. Upon an employee's retirement, both the amount of the fixed benefit to be received monthly from TIAA and the amount of CREF units to be used in determining the amount of benefits to which an employee will be entitled each year under the CREF variable-annuity program are calculated, and the retiree's contract with TIAA-CREF is "settled."[2] This calculation of benefits is based in large part on life expectancy projections, which are determined, in turn, by use of sex-segregated mortality tables. Because women as a class live longer than men as a class, and women as a group are expected, as a result, to receive annuity payments over a longer period of time than similarly-situated men, the use of tables which reflect this male-female difference results in female retirees, who have made pension contributions that are equal to those made by similarly-situated men, receiving monthly payments that are smaller than those received by their male counterparts.[3] It is stipulated among the parties that "[c]ommencing at age 65, the amount of each periodic payment to male annuitants under the single life option is approximately 11.3% greater than the amount payable to female annuitants of the same age." JA 182. It is this result that is challenged as violative of Title VII.
 
 II. Procedural History
 
 10
 Plaintiff initiated this action against TIAA and CREF by filing her complaint on April 15, 1974. On May 29, 1975, she moved for class certification and partial summary judgment. On August 20, 1975, defendants TIAA and CREF cross-moved for summary judgment and to dismiss the complaint pursuant to Rule 19, Fed.R.Civ.P., for failure to join the individual male annuitants in the TIAA-CREF system as indispensable parties to the litigation. On January 23, 1976, the motions for summary judgment were denied on the ground that there existed disputed issues of material fact. At that time decision on the other motions was postponed. On May 5, 1976, TIAA-CREF again moved for partial summary judgment on the ground that plaintiff had failed to properly file with the Equal Employment Opportunity Commission ("EEOC") and the New York State Division of Human Rights the complaints that are jurisdictional prerequisites to suit in the federal district court under Title VII.[4] In addition, defendants moved to dismiss for failure to join plaintiff's employer, LIU, as an indispensable party. In an opinion dated July 1, 1976, the district judge denied defendants' motion for partial summary judgment, denied plaintiff's motion for class certification, and denied defendants' Rule 19 motions except to the extent that plaintiff was directed to file an amended complaint joining LIU as a defendant in the action. After filing an amended complaint, plaintiff moved once again for summary judgment. Defendants TIAA and CREF again cross-moved for summary judgment. In their motions both parties relied heavily on a Stipulation of Facts dated April 21, 1977. On August 9, 1979, Judge Ward filed an opinion, 475 F.Supp. 1298, in which he found that TIAA-CREF's use of sex-based mortality tables violated Title VII of the Civil Rights Act of 1964. Therefore, the district judge granted summary judgment in plaintiff's favor against CREF and enjoined CREF from using sex-based mortality tables in calculating benefits to which retirees would become entitled upon retirement on and after May 1, 1980. However, because the district judge also found that TIAA was in the business of insurance, he granted summary judgment in favor of TIAA on the ground that it was exempted from the provisions of Title VII by the McCarran-Ferguson Act, 15 U.S.C. Sec. 1011 et seq.
 
 
 11
 Although the district judge entered no order directly against TIAA, he did enter an order enjoining LIU from making any contributions, and from requiring its employees to contribute, to any retirement plan that continued to use sex-distinct mortality tables in calculating the periodic benefits to be received by persons retiring on or after June 1, 1980.[5] CREF moved for reargument, contending that the relief granted was improperly retroactive since it would alter the value of benefits that men would receive as a result of contributions made to CREF prior to the date of the district court's decision. This motion was denied on September 12, 1979. In October, 1979, defendants TIAA, CREF, and LIU, and plaintiff Spirt all filed Notices of Appeal from the judgment of the district court. However, these appeals were withdrawn from the active consideration of this Court on January 8, 1980, so that the district judge could supervise the settlement negotiations then proceeding between the parties. During this period, TIAA and CREF made several attempts to design and obtain approval for merged-gender, or "unisex" mortality tables for the calculation of annuity benefits attributable to contributions made after the proposal's adoption.[6] The first of these plans ("Unisex I") was disapproved by the EEOC. After modification, the plan ("Unisex II") was resubmitted and was approved by the EEOC, but was then disapproved by the New York State Superintendent of Insurance, Albert Lewis, in January and February, 1981.[7]
 
 
 12
 By February 19, 1981, settlement negotiations had collapsed, and this Court granted a limited remand of the case to allow consideration of TIAA-CREF's "good faith reliance" defense against the imposition of what they, and, apparently, Superintendent Lewis, considered to be retroactive relief, and to permit the plaintiff to join Superintendent Lewis as a party. Plaintiff then filed a supplemental complaint and a motion for summary judgment. TIAA-CREF cross-moved to dismiss the supplemental complaint for failure to state a claim upon which relief could be granted. In an opinion dated March 19, 1982, 93 F.R.D. 627, the district judge rejected TIAA-CREF's good faith reliance defense, denied plaintiff's motion for summary judgment against Superintendent Lewis, granted defendants' cross-motion to dismiss the supplemental complaint, and granted motions by the EEOC and the American Association of University Professors ("AAUP") to intervene with regard to the issue of "good faith reliance." On March 29, 1982, the district court granted a stay pending appeal of its orders. TIAA-CREF and plaintiff filed Amended Notices of Appeal on April 7, and April 12, 1982, respectively. Virtually all of the issues decided by the district judge are now before us on appeal.
 
 III. Title VII Violation
 
 13
 Title VII of the Civil Rights Act of 1964 was enacted in order to deal with the essential unfairness of employment discrimination. Members of Congress saw its provisions as a necessary element of the comprehensive anti-discrimination legislation of which it was a part because "[t]he rights of citizenship mean little if an individual is unable to gain the economic wherewithal to enjoy or properly utilize them." H.R.Rep.No.914, 88th Cong., 2d Sess., reprinted in [1964] U.S.Code Cong. & Ad.News 2355, 2516. Title VII provides that
 
 
 14
 (a) It shall be an unlawful employment practice for an employer--
 
 
 15
 (1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions or privileges of employment, because of such individual's race, color, religion, sex, or national origin.
 
 
 16
 42 U.S.C. Sec. 2000e-2.
 
 
 17
 In City of Los Angeles Dept. of Water & Power v. Manhart, 435 U.S. 702, 712 n.23, 98 S.Ct. 1370, 1377 n.23, 55 L.Ed.2d 657 (1978), the Supreme Court stated that pension benefits are "compensation" under Title VII, and held that Title VII was violated by an employer-run pension plan that paid all similarly-situated employees equal retirement benefits, but required its female employees, while working, to make larger contributions to the pension fund than its male employees were required to make. In Manhart the Court acknowledged that "[a]s a class women live longer than men," 435 U.S. at 704, 98 S.Ct. at 1373, and that the differential treatment received by individual women was based upon actuarially-sound projections as to the total amount of benefits likely to be received by women as a class. The Court pointed out, however, that Title VII's "focus on the individual is unambiguous. It precludes treatment of individuals as simply components of a racial, religious, sexual, or national class." Id. at 708, 98 S.Ct. at 1375. In addition, the Court found that, "[e]ven a true generalization about the class is an insufficient reason for disqualifying an individual to whom the generalization does not apply." Id. Because there is no way of knowing prior to or at the time of retirement, which individual female retirees will fulfill actuarial predictions as to longevity and in fact live longer than the average male retiree, a requirement that all female employees make larger contributions than all male employees penalizes all female retirees who do not actually live longer than the average male retiree. Such a result, the Supreme Court held, violates Title VII because it does not "pass the simple test of whether the evidence shows 'treatment of a person in a manner which but for that person's sex would be different.' " Id. at 711, 98 S.Ct. at 1377 (footnote omitted).
 
 
 18
 Like the district judge, we can discern no meaningful distinction between the disparate treatment accorded the female employees in Manhart, who were required to contribute a larger percentage of their salaries while working in order to receive monthly retirement benefits equal in amount to those received by their male counterparts, and the disparate treatment accorded the female TIAA-CREF participants in this case. Although female TIAA-CREF participants make contributions to their retirement accounts that are equal in amount to those made by their male counterparts, they are paid a smaller monthly benefit upon retirement simply because they are women. Every federal court that has considered the issue has found that no legally significant difference exists between unequal contributions for equal payments and equal contributions for unequal payments. See, e.g., Retired Public Employees' Association of California v. California, 677 F.2d 733, 735 (9th Cir. 1982); Norris v. Arizona Governing Committee for Tax Deferred Annuity, 671 F.2d 330, 334 (9th Cir. 1982), cert. pet. filed, Docket No. 82-52 (U.S.L.W. July 27, 1982); EEOC v. Colby College, 589 F.2d 1139, 1144 (1st Cir. 1978); Women in City Government United v. City of New York, 515 F.Supp. 295, 298 (S.D.N.Y.1981); Hannahs v. Teachers' Retirement System, 26 FEP Cases 527, 530 (S.D.N.Y.1981); Peters v. Wayne State Univ., 476 F.Supp. 1343, 1350 (E.D.Mich.1979). In fact, it would seem that if there is any meaningful distinction between the two types of sex-based plans, it is the TIAA-CREF type of unequal benefit plan that is more in conflict with the spirit and purposes of Title VII. Each female TIAA-CREF plan participant is maintained at a lower economic level than her male counterparts for as long or short a time as she is alive to receive benefits, regardless of whether she is ultimately one of the few who outlives the average male participant or is one of the 84% of all women who do not outlive their male counterparts. See Norris v. Arizona Governing Committee, supra, 671 F.2d at 332 n.1.
 
 
 19
 The period of time over which the female TIAA-CREF participant will receive the lower benefits awarded her under the present plans is both indefinite and unknowable at the time of retirement. In addition, this lesser benefit will be received at a time when most often the recipient must live on a fixed income, and is unable to increase her benefits as she might increase her salary by working for a promotion during her working years. It is also received at a time--in her older years--when the amount of dollars available to her is apt to crucially affect her ability to meet her basic needs. It was largely because of its concern with this dependence on pension benefits in workers' retirement years that Congress enacted the Employee Retirement Income Security Act, 29 U.S.C. Sec. 1001 et seq. ("ERISA"), in 1974. The House Committee stated in this regard that ERISA's "most important purpose will be to assure American workers that they may look forward, with anticipation, to a retirement with financial security and dignity, and without fear that this period of life will be lacking in the necessities to sustain them as human beings in our society." H.R.Rep.No.533, 93d Cong., 2d Sess., reprinted in [1974] U.S.Code Cong. & Ad.News 4639, 4646.
 
 
 20
 Defendants attempt to argue that the TIAA-CREF plans are fair to both men and women because each individual participant receives a benefit package that is of actuarially equal value. This argument is unconvincing because it is only by virtue of defining an individual in terms of the prohibited classification that the actuarially equal result is reached. It is this very act of classification that results in unfairness to individual members of the class in violation of the clear mandate that compensation, conditions and benefits of employment are to be tested by their disparate effect on individuals rather than groups.
 
 
 21
 In the time elapsed since its decision in Manhart the Supreme Court has not modified in any way its focus on "fairness to individuals rather than fairness to classes," 435 U.S. at 709, 98 S.Ct. at 1375, in Title VII cases. To the contrary, in Connecticut v. Teal, --- U.S. ----, 102 S.Ct. 2525, 73 L.Ed.2d 130 (1982), the Supreme Court held that where a promotional examination had a racially disparate impact on blacks, the employer could not defend the use of the exam on the ground that a higher than average percentage of the blacks who did pass the test were in fact promoted, with the result that the "bottom line" impact was not only nondiscriminatory, but was actually more favorable to blacks as a group than to whites. In reaching its decision the Court stated that "[i]t is clear that Congress never intended to give an employer license to discriminate against some employees on the basis of race or sex merely because he favorably treats other members of the employee's group." --- U.S. at ----, 102 S.Ct. at 2536.
 
 
 22
 We also reject defendants' claim that it would be unfair to equalize the monthly benefits to be received by male and female annuitants because men, as a class, will then receive less total benefits than will women as a class. First, this argument loses sight of the need to focus on impact on individuals as opposed to impact on a class. Further, under an equal benefit system each individual male annuitant will be treated in exactly the same way as each of his female counterparts. Under such a system, an individual male annuitant will be disadvantaged only as compared to his male counterparts who have in the past received larger benefits as a result of TIAA-CREF's sex-based discrimination in their favor. Male participants in TIAA-CREF are not being treated unequally when the risk that each and every annuitant, male and female, will live longer than the average is spread across the entire covered population rather than being imposed on one sub-group within that total population. The fact that such equal spreading of risk may have the result that, from a statistical point of view, men as a class subsidize somewhat the benefits received by women as a class is irrelevant in the context of a statute that seeks fairness to individuals, and is not, in any event, contrary to the continuing intent of Congress, as such intent was evidenced in 1978, when it amended Title VII to overrule the Supreme Court's decision in General Electric Co. v. Gilbert, 429 U.S. 125, 97 S.Ct. 401, 50 L.Ed.2d 343 (1976).
 
 
 23
 In Gilbert the Supreme Court held that an employer's disability benefits plan that failed to provide coverage for pregnancy-related disabilities did not discriminate against women in violation of Title VII. Congress quickly responded to this decision by adding 42 U.S.C. Sec. 2000e(k) to Title VII. That section provided that
 
 
 24
 The terms 'because of sex' or 'on the basis of sex' include, but are not limited to, because of or on the basis of pregnancy, childbirth, or related medical conditions; and women affected by pregnancy, childbirth, or related medical conditions shall be treated the same for all employment-related purposes, including receipt of benefits under fringe benefit programs, as other persons not so affected but similar in their ability or inability to work....
 
 
 25
 Congress was aware that this amendment would increase the cost of work-related disability and health insurance plans, see H.R.Rep.No.948, 95th Cong., 2d Sess., reprinted in [1978] U.S.Code Cong. & Ad.News 4749, 4757-58, and specifically understood and intended that in the case of contributory programs the amendment would require that all employees--not just women--would be assessed their proportionate portion of the incremental cost. Id., [1978] U.S.Code Cong. & Ad.News at 4756.
 
 
 26
 We find, therefore, that TIAA-CREF's use of sex-distinct mortality tables constitutes unequal treatment based solely on an individual's sex. In order for this practice to violate Title VII, however, the unequal treatment must be practiced by an "employer." It is clear that plaintiff's contract for retirement benefits is not with ILU, but with TIAA-CREF, an independent insurer. Plaintiff clearly is not an employee of TIAA-CREF in any commonly understood sense. However, it is generally recognized that "the term 'employer,' as it is used in Title VII, is sufficiently broad to encompass any party who significantly affects access of any individual to employment opportunities, regardless of whether that party may technically be described as an 'employer' of an aggrieved individual as that term has generally been defined at common law." Vanguard Justice Society, Inc. v. Hughes, 471 F.Supp. 670, 696 (D.Md.1979). See also Baker v. Stuart Broadcasting Co., 560 F.2d 389, 391 (8th Cir. 1977); Sibley Memorial Hospital v. Wilson, 488 F.2d 1338 (D.C.Cir.1973); EEOC v. Wooster Brush Co., 523 F.Supp. 1256, 1261-62 (N.D. Ohio 1981); Puntolillo v. New Hampshire Racing Commission, 375 F.Supp. 1089 (D.N.H.1974).
 
 
 27
 We agree with the district judge that TIAA and CREF, which exist solely for the purpose of enabling universities to delegate their responsibility to provide retirement benefits for their employees, are so closely intertwined with those universities, (in this case LIU), that they must be deemed an "employer" for purposes of Title VII. It is also relevant that participation in TIAA-CREF is mandatory for tenured faculty members at LIU, and that LIU shares in the administrative responsibilities that result from its faculty members' participation in TIAA-CREF.
 
 
 28
 In addition, the language of the Supreme Court in Manhart would seem to compel a finding that delegation of responsibility for employee benefits cannot insulate a discriminatory plan from attack under Title VII. The Court stated therein that it did not wish to "suggest, of course, that an employer can avoid his responsibilities by delegating discriminatory programs to corporate shells. Title VII applies to 'any agent' of a covered employer ...." 435 U.S. at 718 n.33, 98 S.Ct. at 1380 n.33. Finally our conclusion here is in accord with that of a number of other courts. These courts have recognized that exempting plans not actually administered by an employer would seriously impair the effectiveness of Title VII, and have held Manhart applicable to pension plans run by third-party insurers. See Norris v. Arizona Governing Committee for Tax Deferred Annuity, 671 F.2d 330 (9th Cir. 1982), cert. pet. filed, Docket No. 82-52 (U.S.L.W. July 27, 1982); EEOC v. Colby College, 589 F.2d 1139, 1141 (1st Cir. 1978) (holding TIAA-CREF subject to Title VII); EEOC v. Wooster Brush Co., 523 F.Supp. 1256, 1266 (N.D.Ohio 1981); Peters v. Wayne State Univ., 476 F.Supp. 1343, 1350 (E.D.Mich.1979) (holding TIAA-CREF subject to Title VII).
 
 IV. Impact of the McCarran-Ferguson Act
 
 29
 Having determined that the TIAA-CREF benefit systems discriminate against women in violation of Title VII, we must determine whether there is any countervailing federal law or policy which renders Title VII inapplicable to TIAA and/or CREF. TIAA and CREF contend that because they are engaged in the business of insurance they are exempted from compliance with Title VII by virtue of the McCarran-Ferguson Act, 15 U.S.C. Sec. 1011 et seq. ("the McCarran Act").
 
 
 30
 The McCarran Act provides, in pertinent part, that
 
 
 31
 [n]o Act of Congress shall be construed to invalidate, impair, or supersede any law enacted by any State for the purpose of regulating the business of insurance, or which imposes a fee or tax upon such business, unless such Act specifically relates to the business of insurance....
 
 
 32
 15 U.S.C. Sec. 1012(b).
 
 
 33
 The McCarran Act will exempt defendants TIAA and/or CREF from conforming their operations to the mandates of Title VII only if (1) defendants are engaged in the business of insurance; (2) Title VII does not specifically relate to the business of insurance; and (3) Title VII, as construed, invalidates, impairs, or supersedes a state law enacted to regulate the business of insurance. The district judge looked to each of these criteria and concluded that the McCarran Act exempted TIAA, but not CREF, from the requirements of Title VII. We find that the McCarran Act exempts neither TIAA nor CREF from such compliance, and reverse the ruling below as to TIAA.
 
 
 34
 Judge Ward found that the McCarran Act did not exempt CREF from compliance with Title VII because CREF was not in the business of insurance. We agree. CREF is a variable annuity company.[8] As such it does not commit itself to pay a pre-determined amount of benefit each month. How much it actually does pay is determined periodically, and directly reflects the results of the fund's investment policies. Thus, a variable annuity company is not subject to the risk that its obligations will exceed its return on investments.
 
 
 35
 As the Supreme Court noted in SEC v. Variable Annuity Co., 359 U.S. 65, 71, 79 S.Ct. 618, 621, 3 L.Ed.2d 640 (1959), variable annuity plans like CREF have a number of the characteristics of insurance. The variable annuity company pays its annuitant on a periodic basis, and continues to do so until the death of the annuitant, or for a fixed period; payments are made from both income and principal; and the amount of benefit each annuitant receives is calculated on the basis of traditional actuarial principles which take into account, inter alia, age and sex. Finally, the issuer assumes the risk of mortality--that is, that the annuitant will live longer than predicted on an actuarial basis. Nevertheless, the Variable Annuity Court found that "absent some guarantee of fixed income, the variable annuity places all the investment risks on the annuitant, none on the company. The holder gets only a pro rata share of what the portfolio of equity interests reflects--which may be a lot, a little, or nothing." Id. (footnote omitted). The Court then went on to hold that since the "concept of 'insurance' involves some investment risk-taking on the part of the company," the issuer of variable annuity contracts is not engaged in the business of insurance and is not protected from federal regulation by virtue of the McCarran Act. Id. See also Group Life & Health Ins. Co. v. Royal Drug Co., 440 U.S. 205, 211-12, 99 S.Ct. 1067, 1073, 59 L.Ed.2d 261 (1979). Therefore, the district judge was correct in holding that CREF is not in the business of insurance and is required to comply with the mandate of Title VII.
 
 
 36
 On the other hand, TIAA commits itself, at the time a plan participant retires, to pay the retiree a specific, fixed amount of money each month. As a result, TIAA is subject to investment risk. Since its contracts, like those issued by CREF, have the other characteristics of insurance contracts, we will assume, as TIAA contends and as the district judge found, that TIAA is in the business of insurance. Our next step, then, is to determine whether Title VII specifically relates to the business of insurance. If not, we must then determine whether a holding that TIAA must pay equal monthly benefits to all of its annuitants would be a holding in which we construed an Act of Congress so as to invalidate, impair, or supersede a state law enacted to regulate the business of insurance in violation of the McCarran Act.
 
 
 37
 The McCarran Act was enacted in 1945 in direct reaction to the Supreme Court's decision in United States v. South-Eastern Underwriters Assoc., 322 U.S. 533, 64 S.Ct. 1162, 88 L.Ed. 1440 (1944), one year before. In South-Eastern Underwriters the Court held that insurance companies involved in insurance transactions across state lines were engaged in interstate commerce and subject to federal regulation under the Commerce Clause. Therefore, the Court found, the price-fixing activities of such insurance companies were subject to attack under the Sherman Antitrust Act. This holding created the fear that traditional forms of state regulation and taxation of insurance companies doing business within the state could be invalidated on Commerce Clause grounds, and that the insurance industry would be thrown into chaos as a result. Thus, Congress' purpose in adopting the McCarran Act was only to ensure that the states would be permitted to fulfill their traditional role in relation to insurance regulation. As stated by the Supreme Court, the intent was, first, "to assure that the States are free to regulate insurance companies without fear of Commerce Clause attack," Group Life & Health Ins. Co. v. Royal Drug Co., supra, 440 U.S. 205, 218 n.18, 99 S.Ct. 1067, 1076 n.18, 59 L.Ed.2d 261, and, second, to give insurance companies only a limited exemption from the antitrust laws. Id. See also SEC v. National Securities, Inc., 393 U.S. 453, 458-59, 89 S.Ct. 564, 567-68, 21 L.Ed.2d 668 (1969) ("Congress was mainly concerned with the relationship between insurance ratemaking and the antitrust laws, and with the power of the States to tax insurance companies."). According to the legislative history, it was "not the intention of Congress to clothe the States with any power to regulate or tax the business of insurance beyond that which they had been held to possess prior to the decision ... in the South-Eastern Underwriters Association case." H.R.Rep.No.143, 79th Cong., 1st Sess., reprinted in [1945] U.S.Code Cong.Svce. 670, 671 (Feb. 13, 1945).
 
 
 38
 We find, based on the historical context, the legislative history, and judicial interpretations of that history, that Congress, in enacting a statute primarily intended to deal with the conflict between state regulation of insurers and the federal antitrust laws, had no intention of declaring that subsequently enacted civil rights legislation would be inapplicable to any and all of the activities of an insurance company that can be classified as "the business of insurance." Accord, EEOC v. Wooster Brush Co., 523 F.Supp. 1256, 1265 (N.D.Ohio 1981); Women in City Government United v. City of New York, 515 F.Supp. 295, 302-03 (S.D.N.Y.1981).
 
 
 39
 The view that the McCarran Act does not render Title VII inapplicable to an employment-related pension plan finds further support in the Congressional debates surrounding the enactment of ERISA (a statute which clearly "specifically relates to the business of insurance") in 1974. It is clear from those debates that the members of Congress believed that Title VII did specifically prohibit racial and sex-based discrimination in pension benefit programs. As summarized by the Seventh Circuit:
 
 
 40
 Senator Mondale and Representative Abzug sought to include in ERISA provisions prohibiting discrimination in the administration of welfare benefit plans. Senator Williams assured Senator Mondale that such an amendment would be unnecessary and might undermine federal antidiscrimination efforts, stating: 'I believe that ... centralized administration of nondiscrimination in employment must be maintained. And I believe this can be done by the Equal Employment Opportunities Commission under terms of existing law.' 119 Cong.Rec. 30409 (1973). Representative Dent reiterated in the House that discrimination could best be prohibited 'under terms of existing law.' 120 Cong.Rec. 4726 (1974). On this basis, ERISA was not amended to prohibit discrimination.
 
 
 41
 Bucyrus-Erie Co. v. Dept. of Industry, Labor & Human Relations, 599 F.2d 205, 211-12 (7th Cir. 1979), cert. denied, 444 U.S. 1031, 100 S.Ct. 701, 62 L.Ed.2d 667 (1980). See also Women in City Government United v. City of New York, 515 F.Supp. 295, 304-05 (S.D.N.Y.1981).
 
 
 42
 Furthermore, in this case Title VII is not being construed to implicitly pre-empt state laws. Title VII contains a broad and explicit pre-emptive provision. See 42 U.S.C. Sec. 2000e-7. That section provides that:
 
 
 43
 Nothing in this subchapter shall be deemed to exempt or relieve any person from liability, duty, penalty, or punishment provided by any present or future law of any State or political subdivision of a State, other than any such law which purports to require or permit the doing of any act which would be an unlawful employment practice under this sub-chapter.
 
 
 44
 To the extent that New York law either permits, or seeks to enforce the use, or continued use, of gender-based mortality tables in violation of Title VII, it is clearly pre-empted under Sec. 2000e-7. The McCarran Act was never meant to prevent, and could not prevent, Congress from explicitly imposing requirements on employers and their agents under the civil rights statutes, the National Labor Relations Act, or any other statute that seeks to enforce compliance with federal policies in such fields as civil rights, labor and other areas of national concern.
 
 
 45
 We hold, therefore, that Title VII explicitly pre-empts New York insurance laws to the extent that they "require or permit" a method of calculating pension benefits that we have found to be "an unlawful employment practice" under Title VII. Therefore, the McCarran Act does not exempt TIAA from complying with the dictates of Title VII. Having so held, we need not reach the question whether application of Title VII will invalidate, impair, or supersede New York State insurance law.[9]
 
 
 46
 It is to be noted, however, that although the State Superintendent of Insurance has approved two sets of proposed unisex mortality tables for calculation of benefits based on contributions made after the date the new plans are approved, he has indicated that he will not approve such tables for use in calculating benefits based on contributions made prior to the effective date of the new plans. Obviously, our holding that Title VII preempts state insurance law with which it conflicts dictates that where the relief ordered necessarily has an impact on contributions paid to TIAA and CREF prior to the effective date of our order, the New York State Superintendent of Insurance will be precluded from disapproving plans designed to conform with the order.[10]
 
 V. Relief
 
 47
 Judge Ward enjoined CREF from using sex-based mortality tables to calculate the number of annuity units to which plan participants are entitled upon their retirement on or after May 1, 1980. He also enjoined LIU from making contributions on behalf of its employees, and/or from requiring its employees to contribute to any retirement plan that continued to use sex-based mortality tables after June 1, 1980. In reviewing an award of relief we must determine whether the judge below abused his discretion "to locate a 'just result' in light of the circumstances peculiar to the case." Albemarle Paper Co. v. Moody, 422 U.S. 405, 424-25, 95 S.Ct. 2362, 2374-75, 45 L.Ed.2d 280 (1975) (quoting Langnes v. Green, 282 U.S. 531, 541, 51 S.Ct. 243, 247, 75 L.Ed. 520 (1931)).
 
 
 48
 In light of our holding that TIAA is subject, as is CREF, to the mandate of Title VII, any relief awarded to plaintiff will apply equally against both.
 
 
 49
 The order enjoining LIU from making contributions to any pension fund making use of sex-based mortality tables to calculate benefits accruing as a result of contributions made after June 1, 1980, logically follows from the holding that the use of such tables constitutes discrimination on the basis of sex in violation of Title VII, and must be affirmed. It is also clear that the part of Judge Ward's order requiring CREF to use gender-neutral mortality tables to calculate benefits that result from contributions made after the effective date of the order, May 1, 1980, must be affirmed, and extended to include TIAA. Defendants have already attempted to revise their practices to conform to the above. However, they have not presented for approval gender-neutral tables for the calculation of benefits based on contributions made prior to May 1, 1980, but first payable upon a plan participant's retirement after that date. Instead, they have argued that any further relief would be improper since it would "retroactively" affect the value of contributions made prior to the district court's order in this case. They contend that the Manhart Court's rejection of the plaintiffs' claims for retroactive relief in that case dictates that no retrospective relief is available here. Assuming, without deciding, that the part of Judge Ward's order that affects the value of contributions made prior to the entry of judgment in this case constitutes retroactive relief, nothing in Manhart proscribes such a result. The Manhart Court itself pointed out that "[t]o the point of redundancy, the statute stresses that retroactive relief 'may' be awarded if it is 'appropriate,' " 435 U.S. at 719, 98 S.Ct. at 1380, and that the "presumption in favor of retroactive liability can seldom be overcome." Id. The Court then went on to find that under the special circumstances presented in that case retroactive relief was not "appropriate." In so finding the Court stated:
 
 
 50
 For several reasons, we conclude that the District Court gave insufficient attention to the equitable nature of Title VII remedies. Although we now have no doubt about the application of the statute in this case, we must recognize that conscientious and intelligent administrators of pension funds, who did not have the benefit of the extensive briefs and arguments presented to us, may well have assumed that a program like the Department's was entirely lawful .... [P]ension administrators could reasonably have thought it unfair--or even illegal--to make male employees shoulder more than their 'actuarial share' of the pension burden. There is no reason to believe that the threat of a backpay award is needed to cause other administrators to amend their practices to conform to this decision.
 
 
 51
 435 U.S. at 722-23, 98 S.Ct. at 1382 (footnotes omitted) (emphasis added). The Supreme Court then characterized its decision as a "marked departure," 435 U.S. at 722, 98 S.Ct. at 1382, from past practice, and stated that since retroactive relief in the form of refunds to women of the additional moneys they had paid into the fund in the past would constitute an enormous unforeseen liability that would threaten the solvency of the fund, a "backpay award" was unjustified. In this case, however, none of the factors that influenced the Manhart Court is present to render "inappropriate" an order of relief that affects the value of contributions paid to the pension fund prior to the entry of judgment below. First, Manhart was decided by the Supreme Court over four years ago. Since the decision of that case a number of federal district courts and courts of appeals have declared plans like those at issue here to be unlawful in light of Manhart. See Retired Public Employees' Association of California v. California, 677 F.2d 733 (9th Cir. 1982); Norris v. Arizona Governing Committee for Tax Deferred Annuity, 671 F.2d 330 (9th Cir. 1982), cert. pet. filed, Docket No. 82-52 (U.S.L.W. July 27, 1982); EEOC v. Colby College, 589 F.2d 1139 (1st Cir. 1978); Women in City Government United v. City of New York, 515 F.Supp. 295 (S.D.N.Y.1981); Hannahs v. Teachers' Retirement System, 26 FEP Cases 527 (S.D.N.Y.1981); Peters v. Wayne State Univ., 476 F.Supp. 1343 (E.D.Mich.1979). The record indicates further that in 1974, as a result of the Secretary of Labor's public request for comments on proposed sex discrimination guidelines, TIAA-CREF wrote to its member institutions in order to encourage them to oppose regulations requiring the use of gender-neutral mortality tables. See JA 485-87. In addition, this suit was filed against TIAA-CREF in April, 1974. The Peters action was filed in 1976. 476 F.Supp. 1343, 1345. In 1978 the First Circuit reversed the Maine District Court's grant of summary judgment in favor of defendants in EEOC v. Colby College, 589 F.2d 1139 (1st Cir. 1978), and remanded for further proceedings. Both Peters and Colby College, as well as other suits not yet decided, involved TIAA-CREF, and certainly put defendants TIAA-CREF on notice as to the questionability of their practices. They have had ample opportunity to "voluntarily" revise their mortality tables. The possibility of an order such as that entered by the district court, and by this court today, was foreseeable at least since 1974.[11]
 
 
 52
 It also must be recognized that the "retroactive" relief awarded here is not nearly so drastic as that sought by plaintiffs and awarded by the district court in Manhart. There the district court's order that all female employees and retirees receive refunds of all excess contributions made to the plan since April 5, 1972, when Title VII became applicable to governmental employers, see Manhart v. City of Los Angeles Dept. of Water & Power, 553 F.2d 581, 583 (9th Cir. 1976), vacated and remanded, 435 U.S. 702, 98 S.Ct. 1370, 55 L.Ed.2d 657 (1978), required Plan administrators to remove money from the fund for this purpose. The fund would nevertheless have been required, at the same time, to meet undiminished obligations. In the present case a "retroactive" award does not require the wholesale removal of moneys from TIAA-CREF reserves. The equalization of the amount of monthly payments to be received by similarly-situated male and female employees can be calculated so as not to change the total anticipated obligations of the funds. A result which did not affect past contributions and granted only "prospective" relief, as that is defined by defendants, would effectively postpone full conversion to gender-neutral tables for as much as 30 to 40 years.
 
 
 53
 Finally, we must reject the argument that an award of relief that adversely affects the value of contributions made by or on behalf of male employees prior to the date of the order herein will unfairly violate those males' expectations of receiving pension benefits based on mortality tables that discriminate in their favor. First, this argument assumes that male employees had some clearly settled expectations that will be violated. On the contrary, the literature distributed to TIAA-CREF participants emphasizes the difficulty involved in accurately predicting the amount of retirement annuity income to be expected by an individual participant. The literature states that:
 
 
 54
 The amount of your retirement income will depend on the number of years you participate in the plan, the amount of premiums paid each year during your participation, your age at time of retirement, the experience of TIAA and CREF, the income option you select at retirement, and other factors. Although it is not possible to predict the effect of each of these factors upon your retirement income, the remaining portion of this booklet should be helpful in calculating the benefits that would be produced under certain conditions.
 
 
 55
 "TIAA-CREF: Your Retirement Annuity" at 14, JA 233. Later in the same publication it is stated that "[j]ust as you can't predict your future salary or retirement age, neither can TIAA predict economic and social conditions. Therefore, the TIAA annuity amounts may be greater or less than those shown because of the following factors: ..." Id. at 16, JA 234. It is then stated, inter alia, that on three months' notice TIAA can establish a new rate schedule for future premiums. Id. While TIAA does guarantee its participants certain minimal monthly payments, the amounts guaranteed are so low--since they are figured on the basis of a 2 1/2% return on investments, see JA 197--that there is no danger that the male participants' expectation that they will receive the minimal guaranteed benefit will be jeopardized by the relatively minor changes in the value of past benefits necessitated by the relief ordered herein.
 
 
 56
 CREF, on the other hand, guarantees plan participants no specified amount of monthly payments. The TIAA-CREF publication which explains the CREF system states that:
 
 
 57
 The CREF annuity pays you a retirement income that varies year by year, reflecting primarily the experience of the securities in CREF's portfolio. When you retire, your accumulation units are converted into a lifetime monthly income of a fixed number of 'annuity units.' ... The number of annuity units payable to you each month for life depends on such factors as how many accumulation units you own at time of retirement, the age at which you retire, your sex, and whether you choose an income method that continues payments to a beneficiary after your death.
 
 
 58
 "TIAA-CREF--CREF Units At Work" at 3; JA at 415. Based on statements such as this, no employees could have had settled expectations as to the amount of monthly benefits they would receive upon retirement.
 
 
 59
 While it is true that the above-quoted literature states, as does other literature sent to TIAA-CREF participants, that sex will be considered in calculating the amount of monthly benefits to be received after retirement, these statements are neither so clear, nor are they highlighted in such a way, that it is plausible to think that male plan participants relied upon them in any meaningful way. In any case, such statements would not be a major factor in inducing men to participate in TIAA-CREF plans. First, at least at LIU, participation has been mandatory for most covered employees. Second, the uniqueness of TIAA-CREF, particularly its qualities of immediate vesting and portability, would constitute inducements to participation more powerful than the belief that men's benefits would be paid at a rate higher than those paid to similarly-situated women. It is also not clear that men could actually do better purchasing a plan on the open market than they will by participating in TIAA-CREF plans that make use of gender-neutral tables, given the economies of scale that would presumably be present in the administration of such a large group plan. Further, the benefits to be received by many male participants will be unaffected by the shift to gender-neutral tables because approximately 60% of all male participants select a joint-survivor option which provides for an income that continues for the duration of their wives' lifetimes as well as their own. See TIAA-CREF, The Participant (March, 1980) at 2, JA 550. Since in these cases actuarial projections as to the wives' likelihood of surviving, based on sex-based mortality tables, have always been figured into the calculation of the amount of benefits to be received by their husbands upon retirement, the change will have little or no impact on the benefits to be received by these men. Id.[12]
 
 
 60
 Finally, reliance on the continued use of sex-distinct mortality tables by male pension plan participants was unjustified in light of the visibility of the issue of the legality of using such tables, at least since it was brought to the attention of all participants in 1973. See TIAA-CREF, The Participant (July, 1973), JA 477-84.
 
 
 61
 A delayed award such as that which defendants contend is proper would fly in the face of the primary purpose of Title VII--to "make persons whole for injuries suffered on account of unlawful employment discrimination." Albemarle Paper Co. v. Moody, 422 U.S. 405, 418, 95 S.Ct. 2362, 2372, 45 L.Ed.2d 280 (1975). We therefore hold that CREF was properly enjoined from using sex-distinct mortality tables to calculate the number of annuity units to which all persons retiring after May 10, 1980 are entitled, and TIAA is now similarly enjoined from using sex-distinct mortality tables to calculate the amount of monthly benefits to which its participants are entitled upon retirement. This order will affect all calculations of retirement benefits made after May 1, 1980, as per the stipulation between the parties dated March 29, 1982. JA 792-93. In addition, LIU was properly enjoined from making contributions to, or requiring its employees to make contributions to, any pension fund that continues to use gender-based mortality tables to calculate retirement benefits for employees retiring after June 1, 1980. See JA 792-93.
 
 
 62
 Affirmed in part, reversed in part, and remanded for further proceedings not inconsistent with this opinion.
 
 
 
 *
 The Honorable John M. Cannella, Senior United States District Judge for the Southern District of New York, sitting by designation
 
 
 [1]
 Although it is assumed that most TIAA-CREF participants will receive their retirement benefits on a monthly basis, an annuitant may choose to receive annuity payments quarterly, semi-annually, or annually, rather than monthly. JA 196. Also, rather than simply receiving benefit payments for the duration of one's own life (a single life annuity), a retiree can opt for a life annuity with a ten or twenty year guaranteed period, or for a joint-life option, under which benefits will continue throughout the lives of both the retiree and a named beneficiary. JA 383
 
 
 [2]
 Under the TIAA-CREF system a retiree has no right to receive a lump sum payment for the full value of contributions paid into the fund. However, upon retirement a participant may choose to receive up to 10% of accumulated contributions for use in dealing with transitional costs. Receipt of such a payment results, of course, in a corresponding decrease in the amount of moneys available for annuity payments
 
 
 [3]
 "Similarly-situated" individuals are those who are the same age, retire on the same date, and have identical amounts of accumulated contributions in their individual retirement accounts on the date of retirement
 
 
 [4]
 We agree with the district judge that neither plaintiff's failure to file a complaint with the EEOC prior to initiating her suit in the district court, nor her alleged failure to pursue her state remedies, served to defeat the jurisdiction of the district court over this action. See Egelston v. State Univ. College at Geneseo, 535 F.2d 752, 754-55 (2d Cir. 1976)
 
 
 [5]
 This order obviously meant that LIU could no longer deal with TIAA unless TIAA "voluntarily" began to use gender-neutral mortality tables to calculate the benefits to be received by a retiring plan participant. It was also always clear that TIAA and CREF are so closely intertwined that, as a practical matter, TIAA would have to make changes in its method of calculating accrued benefits in order to synchronize with any changes made by CREF. Indeed, at a hearing after remand, Judge Ward stated, "I have always visualized TIAA and CREF somewhat like twins and I sort of separated the Siamese twins but I recognize that though I may have separated them in one way from a practical and business point of view they must follow the same course." JA 683
 
 
 [6]
 Apparently no attempt was ever made to design unisex tables for use in calculating benefits based on contributions accumulated prior to the date of the district court's order, although such tables would have been required if the parties were to comply fully with that order
 
 
 [7]
 The disapproval of "Unisex II" was based on the Superintendent's view that the change would unfairly deprive male participants of the full value of contributions made while TIAA-CREF was using sex-based mortality tables. JA 621. Superintendent Lewis did approve a later merged-gender proposal ("Unisex III"), but Unisex III was disapproved by the EEOC, which viewed it as violative of Title VII and the Equal Pay Act
 
 
 [8]
 The Supreme Court noted in SEC v. Variable Annuity Co., 359 U.S. 65, 69, 79 S.Ct. 618, 620, 3 L.Ed.2d 640 (1959), that CREF was the first variable annuity company in the United States
 
 
 [9]
 In light of our holding that Title VII applies to both TIAA and CREF and that it has been violated by their sex-based method of calculating retirement benefits, we need not reach the secondary issues raised on appeal
 
 
 [10]
 We note that the Superintendent has indicated that he will, of course, comply with a final order of this Court
 
 
 [11]
 The pension plan at issue in Manhart had been altered to equalize both contributions and benefits for male and female employees by the time that case reached the Supreme Court. The change was effective on January 1, 1975, see 435 U.S. at 706, 98 S.Ct. at 1374, prior to the affirmance of the district court's order by the Ninth Circuit. The plan at issue in Retired Public Employees Association of California v. California, 677 F.2d 733 (9th Cir. 1982), also was amended in 1977 to equalize contributions and benefits for male and female employees. Id. at 734 n.1
 
 
 [12]
 Thus, the changes mandated by this decision will reduce the benefits that would be received by approximately 40% of male TIAA-CREF participants, based on sex-distinct mortality tables, by between 1% and 8%. See TIAA-CREF, The Participant (March, 1980) at 2, JA 550