EASTERBROOK, Circuit Judge.
Is redlining in the insurance business a form of racial discrimination violating the Fair Housing Act? “Redlining” is charging higher rates or declining to write insurance for people who live in particular areas (figuratively, sometimes literally, enclosed with red lines on a map). The NAACP, its Milwaukee Branch, and eight of its members contend in this class action that redlining violates the Fair Housing Act, 42 U.S.C. §§ 3601-19, and four other rules of state and federal law when insurers draw their lines around areas that have large or growing minority populations.
Plaintiffs contend that a mortgage loan usually is- essential to home ownership, and that lenders are unwilling to provide credit unless the borrower obtains insurance on the house that serves as security for the loan. Higher premiums price some would-be buyers out of the market; a refusal to write insurance excludes all buyers. If insurers redline areas with large or growing numbers of minority residents, that practice raises the cost of housing for black persons and also frustrates their ability to live in integrated neighborhoods. Even if they achieve their goal, they pay extra.
The complaint asserts that American Family Mutual Insurance Company engages in redlining in and near Milwaukee. The district judge concluded that two of plaintiffs’ five theories are legally insufficient. See Fed.R.Civ.P. 12(b)(6). Following Mackey v. Nationwide Insurance Cos., 724 F.2d 419, 423-24 (4th Cir.1984), he held that the Fair Housing Act (Title VIII of the Civil Rights Act of 1968) does not apply to the property and casualty insurance business. And he held that Wisconsin would not recognize a private right of action to enforce the antidiscrimination portions of its insurance code. At the conclusion of his oral ruling, the judge entered a partial final judgment on these two theories under Fed. R.Civ.P. 54(b).
Because the district judge dismissed claims under Title VIII and Wisconsin’s insurance code in advance of discovery, we must assume that plaintiffs can establish that the defendant intentionally discriminates on account of race. That is, we must assume that the plaintiffs can establish disparate treatment and not just a disparate impact of decisions made on actuarial grounds. The distinction is important not only because the Supreme Court has yet to decide whether practices with disparate impact, violate Title VIII, see Huntington v. NAACP, 488 U.S. 15, 109 S.Ct. 276, 102 L.Ed.2d 180 (1988), but also because of the nature of insurance. Insurance works best when the risks in the pool have similar characteristics. For example, term life insurance costs substantially more per dollar of death benefit for someone 65 years old than for one 25 years old, although the expected return per dollar of premium is the same to both groups because the older person, who pays more, also has a higher probability of dying during the term. Auto insurance is more expensive in a .city than in the countryside, because congestion in cities means more collisions. Putting young and old, or city and country, into the same pool would lead to adverse selection: people knowing that the risks they face are less than the average of the pool would drop out. A single price for term life insurance would dissuade younger persons from insuring, because the price would be too steep for the coverage offered; the remaining older persons would pay a price appropriate to their age, but younger persons would lose the benefits of insurance altogether. To curtail adverse selection, insurers seek to differentiate risk classes with many variables.
Risk discrimination is not race discrimination. Yet efforts to differentiate more fully among risks may produce classifications that could be generated by discrimination. Recall the dispute, in both courts and journals, whether separate annuity tables for women are sex discrimination. See *291 Arizona Governing Committee v. Norris, 463 U.S. 1073, 103 S.Ct. 3492, 77 L.Ed.2d 1236 (1983); George J. Benston, The Economics of Gender Discrimination in Employee Fringe Benefits: Manhart Revisited, 49 U.Chi.L.Rev. 489 (1982); Lea Bril-mayer, et al., Sex Discrimination in Employer-Sponsored Insurance Plans: A Legal and Demographic Analysis, 47 U.Chi.L.Rev. 505 (1980). No insurer openly uses race as a ground of ratemaking, but is a higher rate per $1,000 of coverage for fire insurance in an inner city neighborhood attributable to risks of arson or to racial animus?
A disparate treatment approach assigns burdens of proof and persuasion to the plaintiff, while a disparate impact approach places them on the insurer. Allocation of these burdens is bound to affect many cases, given the difficulty in drawing inferences. For example, a recent study by the Federal Reserve System concluded that black applicants for mortgage loans are' more likely to be turned down, holding income constant. Glenn B. Canner & Dolores S. Smith, Home Mortgage Disclosure Act: Expanded Data on Residential Lending, 77 Fed.Res.Bull. 859, 868-76 (1991). Is this attributable to applicants’ race, to the fact that they seek loans that are larger multiples of their average wealth, or to difficulties of obtaining insurance that may (or may not) themselves have a racial component? The Federal Reserve reported data on applicants’ income but not their wealth or the value of the loans sought, both important variables. The greater the uncertainty in drawing inferences, the more the placement of the burden matters. We mention this not to resolve the question but to make clear that we have not done so by indirection. All we decide is whether the complaint states claims on which the plaintiffs may prevail if they establish that the insurer has drawn lines according to race rather than actuarial calculations.
I
Appellate jurisdiction is the first question. Rule 54(b) allows a court to “direct the entry of a final judgment as to one or more but fewer than all of the claims or parties” but does not employ a special meaning of “final”. So it does not authorize appeal of decisions ■ that, if made in stand-alone litigation, woiild not be final. Liberty Mutual Insurance Co. v. Wetzel, 424 U.S. 737, 96 S.Ct. 1202, 47 L.Ed.2d 435 (1976); Horn v. Transcon Lines, Inc., 898 F.2d 589 (7th Cir.1990). Unless the court enters judgment on an entire “claim,” or wraps up the case with respect to all claims involving a particular party; Rule 54(b) does not permit an immediate appeal. Steve’s Homemade Ice Cream, Inc. v. Stewart, 907 F.2d 364 (2d Cir.1990); FDIC v. Elefant, 790 F.2d 661, 664 (7th Cir.1986); Horn, 898 F.2d at 593-95.
The district judge did not discuss the legal and factual overlap between the two counts being dismissed and the three being retained and did not explain why he viewed them as separate claims. A “claim for relief” seeks redress of a distinct wrong;' .a distinct legal underpinning differs from a new claim and is not independently appealable. A/S Apothekerhes Laboratorium for Specialpraeparater v. I.M.C. Chemical Group, Inc., 725 F.2d 1140, 1142-43 (7th Cir.1984). Yet the district judge appears to have equated theories with claims. He observed that because a trial lay more than a year in the future there was ample time to resolve these two legal disputes on appeal so that all theories could be handled during one trial. This suggests that the judge confused Rule 54(b) with 28 U.S.C. § 1292(b), which permits a court to certify the case for discretionary appeal when interlocutory resolution of important issues could advance the final disposition of the litigation. Because of the mismatch between the district court's stated rationale and the scope of Rule 54(b) — and the apparent overlap of the two dismissed counts with the three retained — our jurisdiction is in doubt.
Plaintiffs’ complaint begins with 66 paragraphs and then states five “claims,” each of which incorporates these paragraphs and asserts one reason why the conduct is wrongful. The Fair Housing *292 Act and the state insurance code are two. The other three: Wisconsin’s Fair Housing Act, 42 U.S.C. § 1981 (the right to be free of racial discrimination in making contracts), and 42 U.S.C. § 1982 (the right to be free of racial discrimination in buying real property). Perhaps the judge was led astray by the structure of the complaint. Identifying legal theories may assist defendants and the court in seeing how the plaintiff hopes to prevail, but this organization does not track the idea of “claim for relief” in the federal rules. Putting each legal theory in a separate count is a throwback to code pleading, perhaps all the way back to the forms of action; in both, legal theory. and facts together created a “cause of action.” The Rules of Civil Procedure divorced factual from legal aspects of the claim and replaced “cause of action” with “claim for relief” to signify the difference. Bartholet v. Reishauer A. G. (Zürich), 953 F.2d 1073, 1078 (7th Cir.1992). A complaint should limn the grievance and demand relief. It need not identify the law on which the claim rests, and different legal theories therefore do not multiply the number of claims for relief.
One set of facts producing one injury creates one claim for relief, no matter how many laws the deeds violate. Car Carriers, Inc. v. Ford Motor Co., 789 F.2d 589 (7th Cir.1986); Supporters to Oppose Pollution, Inc. v. Heritage Group, 973 F.2d 1320, 1325-27 (7th Cir. Aug. 28, 1992). Plaintiffs could not litigate and lose a suit asserting that American Family’s redlining violates Title VIII, pursue another asserting that redlining violates § 1981, and then crank up a third asserting that redlining violates § 1982. If these principles — well understood when dealing with the preclusive effects of judgments — define a “claim” for purposes of Rule 54(b), then this appeal must be dismissed.
Language in some of our cases equates “claim” in Rule 54(b) with “claim” for purposes of res judicata, but as we observed in Olympia Hotels Corp. v. Johnson Wax Development Corp., 908 F.2d 1363, 1367 (7th Cir.1990), this equivalence cannot accommodate the many cases that permit separate appeals of claims and compulsory counterclaims. E.g., Cold Metal Process Co. v. United Engineering & Foundry Co., 351 U.S. 445, 452, 76 S.Ct. 904, 908, 100 L.Ed. 1311 (1956). It follows that two “claims” may arise out of the same transaction for purposes of Rule 54(b), provided that the facts and theories are sufficiently distinct. Buckley v. Fitzsimmons, 919 F.2d 1230, 1237 (7th Cir. 1990), remanded, — U.S. —, 112 S.Ct. 40, 116 L.Ed.2d 19 (1991), after remand, 952 F.2d 965 (7th Cir.1992). Two legal theories sufficiently distinct that they call for proof of substantially different facts may be separate “claims.” Stearns v. Consolidated Management, Inc., 747 F.2d 1105, 1108-09 (7th Cir.1984); Jack Walters & Sons Corp. v. Morton Building, Inc., 737 F.2d 698, 702-03 (7th Cir.1984).
“Sufficiently” and “substantially” are hedges. Ideally the facts and theories separated for immediate appeal should not overlap with those retained; to the extent they do, the court of appeals is “deciding” claims still pending in the district court, and may have to cover the same ground when the district court acts on the residue. A combination of anticipation with overlap leads to wasteful duplication and increases the-likelihood of conflict (or error). In disdaining bright lines and asking how much duplication is too .much, we enter the zone of shadings traditionally committed to a district judge’s discretion. So the Supreme Court emphasized in Curtiss-Wright Corp. v. General Electric Co., 446 U.S. 1, 8-10, 100 S.Ct. 1460, 1464-66, 64 L.Ed.2d 1 (1980).
Although the district judge in our case confused Rule 54(b) with § 1292(b), we do not believe that he abused his discretion in permitting an immediate appeal. American Family stated, in its memorandum concerning appellate jurisdiction, that “the dismissed Fair Housing Act claim, would, if it were viable, be subject to proof under a disparate impact formula, rather than under the ‘intentional racial discrimination’ test applicable to all the counts remaining in the district court.” Huntington and Bellwood v. Dwivedi, 895 F.2d 1521, 1529- *293 30 (7th Cir.1990), show that this concession may have been imprudent, and American Family has tried to recant. But the parties shared this belief in the district court, and the district judge may well have relied on it when deciding to enter judgment under Rule 54(b). Retraction thus comes too late — not only for purposes of this appeal, but also for the whole case. (Treating American Family’s concession as binding on appeal but not back in the district court would create precisely the wasted effort that Rule 54(b) is set against.) We therefore assume that plaintiffs' burden under Title VIII is lighter than their burden under the other legal theories. Different bur-. dens may imply different “claims” even for purposes of preclusion. E.g., Emerald Cut Stones v. United States, 409 U.S. 232, 93 S.Ct. 489, 34 L.Ed.2d 438 (1972); United States v. 89 Firearms, 465 U.S. 354, 104 S.Ct. 1099, 79 L.Ed.2d 361 (1984); cf. United States v. Fonner, 920 F.2d 1330, 1332-33 (7th Cir.1990). Resolving the Title VIII issue in plaintiffs’ favor implies that the other legal theories will fall away. If they prevail under Title VIII, they obtain all the relief they seek; if they lose at trial under Title VIII, they necessarily lose on all other theories; either way, there will not be du-plicative appellate review. Steams holds that this is enough, if barely, to justify treating a legal theory as a “claim” for purposes of Rule 54(b).
One additional jurisdictional problem needs attention. American Family insists that there is no case or controversy within the meaning of Article III because none of the plaintiffs has been unable to buy a house. This is strictly a constitutional argument, for the definition of “aggrieved person” in Title VIII, 42 U.S.C. § 3602(i), eliminates any prudential barriers to adjudication. Gladstone, Realtors v. Bellwood, 441 U.S. 91, 98-99, 99 S.Ct. 1601, 1607-08, 60 L.Ed.2d 66 (1979); Havens Realty Corp. v. Coleman, 455 U.S. 363, 372-73, 102 S.Ct. 1114, 1120-21, 71 L.Ed.2d 214 (1982). Congress amended the statute in 1988 to authorize suit by anyone who “believes that [he] will be injured by a discriminatory housing practice that is about to occur”, § 3602(i)(2), and unless this statute is unconstitutional several of the plaintiffs (and the NAACP itself, as an organization whose members include many black persons in the housing market) have standing.
After Lujan v. Defenders of Wildlife, — U.S. —, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992), any litigant must show how he has been injured. Because this case was dismissed on the pleadings, “general factual allegations of injury resulting from the defendant’s conduct may suffice”. Id. — U.S. at —, 112 S.Ct. at 2137. See also Lucas v. South Carolina Coastal Council, — U.S. —, — n. 3, 112 S.Ct. 2886, 2892 n. 3, 120 L.Ed.2d 798 (1992). Paragraph 47 of the complaint implies that lack of insurance delayed one of the plaintiffs in closing on a house; delay in obtaining a valuable thing is an injury. So is paying a higher price for insurance or any other good or service. Plaintiffs cannot rest on their pleadings; once jurisdiction is contested (as it had been here) “each element [essential to justiciability] must be supported in the same way as any other matter on which the plaintiff bears the burden of proof”. Lujan, — U.S. at —, 112 S.Ct. at 2136. If they can prove the essential allegations of the complaint, however, plaintiffs have standing.
II
Any effort to use federal law to prescribe or penalize the behavior of insurers must reckon with the McCarran-Ferguson Act. Section 2(b) of this statute, 15 U.S.C. § 1012(b), provides: “No Act of Congress shall be construed to invalidate, impair, or supersede any law enacted by any State for the purpose of regulating the business of insurance ... unless such Act specifically relates to the business of insurance”. American Family is engaged in the business of insurance; plaintiffs complain about how, and at what price, American Family writes (or declines to write) policies of insurance. The McCarran-Ferguson' Act establishes a form of inverse preemption, letting state law prevail over general federal rules — those that do not “specifically relate[] to the business of insurance.” Title VIII does not mention insurance and *294 therefore cannot apply to its endeavors, American Family concludes. Plaintiffs rejoined at oral argument that racial discrimination is not insurance. The Fair Housing Act requires race-blind practices in housing and related services; it does not tell anyone how to write insurance and therefore does not regulate the business of insurance, plaintiffs conclude.
Doubtless there is a difference between the business of insurance and the business of insurers. Pilot Life Insurance Co. v. Dedeaux, 481 U.S. 41, 107 S.Ct. 1549, 95 L.Ed.2d 39 (1987); Union Labor Life Insurance Co. v. Pireno, 458 U.S. 119, 102 S.Ct. 3002, 73 L.Ed.2d 647 (1982); Group Life & Health Insurance Co. v. Royal Drug Co., 440 U.S. 205, 230 n. 38, 99 S.Ct. 1067, 1082 n. 38, 59 L.Ed.2d 261 (1979). But it is not helpful to point to a practice forbidden by federal law (here, racial discrimination) and observe that this practice is not itself insurance. Discrimination is not insurance, but then neither is a conspiracy in restraint of trade. By such a maneuver we could declare that the antitrust laws apply with full rigor to the insurance industry; yet the main target of the McCarran-Ferguson Act was United States v. South-Eastern Underwriters Ass’n, 322 U.S. 533, 64 S.Ct. 1162, 88 L.Ed. 1440 (1944), which applied the antitrust laws to insurance. Plaintiffs say that the Fair Housing Act tells American Family how to behave in deciding which risks it will accept, at what price, in its dealings with potential insureds; that is the core of insurance.
A stronger argument appears in plaintiffs’ reply brief: that the McCarran-Fer-guson Act does not apply to subsequently enacted civil rights statutes. This submission has the support of Spirt v. Teachers Insurance and Annuity Ass’n, 691 F.2d 1054, 1064-66 (2d Cir.1982), vacated on other grounds, 463 U.S. 1223, 103 S.Ct. 3565, 77 L.Ed.2d 1406 (1983), on remand, 735 F.2d 23 (1984), and a few decisions by district courts. The second circuit wrote:
We find, based on the historical context, the legislative history, and judicial interpretations of that history, that Congress, in enacting a statute primarily intended to deal with the conflict between state regulation of insurers and the federal antitrust laws, had no intention of declaring that subsequently enacted civil rights legislation would be inapplicable to any and all of the activities of an insurance company that can be classified as “the business of insurance.”
691 F.2d at 1065. Well of course Congress had no intention in the 1940s of curtailing the scope of laws yet to be enacted — indeed, inconceivable at the time. (After southern states regained representation in the Senate following the Civil War, no civil rights laws were enacted until 1957. See 71 Stat. 634.) What Members of Congress may have “intended” in 1945, when Congress enacted a statute limited to the antitrust laws, and 1946, when it extended the McCarran-Ferguson Act to other federal laws, is not, however, the question. We must determine what Congress meant by what it enacted, not what Senators and Representatives said, thought, wished, or hoped. In re Sinclair, 870 F.2d 1340 (7th Cir.1989). Cf. West Virginia University Hospitals, Inc. v. Casey, — U.S. —, —-— & n. 7, 111 S.Ct. 1138, 1147-49 & n. 7, 113 L.Ed.2d 68 (1991); American Hospital Ass’n v. NLRB, — U.S. —, —-—, 111 S.Ct. 1539, 1545-46, 113 L.Ed.2d 675 (1991). What Congress passed and the President signed — what the second circuit never quoted — is that “[n]o Act of Congress shall be construed to invalidate, impair, or supersede any law enacted by any State for the purpose of regulating the business of insurance ... unless such Act specifically relates to the business of insurance.” “No Act of Congress” differs from “no act on the books in 1946” or “no act other than a civil rights statute.”
“No Act of Congress” could not be more comprehensive. The McCarran-Ferguson Act creates a rule of construction applicable to all other federal laws, a “plain statement” approach. We had no difficulty applying the Act to subsequent legislation such as the Truth in Lending Act. Lowe v. AARCO-American, Inc., 536 F.2d 1160 (7th Cir.1976). The second circuit posed the wrong question when inquiring wheth *295 er Congress meant to insulate the insurance business from civil rights laws. Congress did not tie its hands; instead it prescribed the consequences of silence and specificity in other acts past and future. Federal laws that do not conflict with or supersede state rules always apply; federal laws inconsistent with state laws apply when Congress says so directly. Plaintiffs’ problem is that Congress did not say so, even obliquely, in the Fair Housing Act.
Spirt and all of the district court decisions reaching a similar conclusion predate Norris, in which four Justices concluded that the McCarran-Ferguson Act applies to Title VII of the Civil Rights Act of 1964. 463 U.S. at 1099-1103, 103 S.Ct. at 3507-09 (Powell, J., joined by Burger, C.J.,' and' Blackmun & Rehnquist, JJ., concurring in part and dissenting in part). The other five Justices found it unnecessary to address the issue. Id. at 1087 n. 17. No Justice disagreed with Justice Powell, then or since. Spirt also predates Pilot Life Insurance, in which all nine Justices concluded that the McCarran-Ferguson Act applies to the Employee Retirement Income Security Act of 1974. Written a decade ago, Spirt might have looked to Mitchum v. Foster, 407 U.S. 225, 92 S.Ct. 2151, 32 L.Ed.2d 705 (1972), which held that 42 U.S.C. § 1983 is specific enough to satisfy the Anti-Injunction Act, 28 U.S.C. § 2283. More recent cases have declined to extend the approach of Mitchum to create other exceptions to § 2283. Chick Kam Choo v. Exxon Corp., 486 U.S. 140, 108 S.Ct. 1684, 100 L.Ed.2d 127 (1988); Vendo Co. v. Lektro-Vend Corp., 433 U.S. 623, 97 S.Ct. 2881, 53 L.Ed.2d 1009 (1977); Bolingbrook v. Citizens Utilities Co., 864 F.2d 481 (7th Cir.1988); see also Martin H. Redish, The Anti-Injunction Statute Reconsidered, 44 U.Chi.L.Rev. 717 (1977). No Justice has suggested using Mitchum as a model approach to statutes other than § 2283. Perhaps the second circuit will take a new look at Spirt if the problem comes up again. No matter how our colleagues on the east coast would approach the subject today, however, we conclude that Congress should be taken at its word. The Fair Housing Act is an “Act of Congress” that does not “specifically relate[ ] to the business of insurance”. It therefore does not “invalidate, impair, or supersede any law enacted by any State for the purpose of regulating the business of insurance”.
Although American Family insists that this conclusion ends the case, it does not. What state law regulating the business of insurance does Title VIII “invalidate, impair, or supersede”? None that we could find. American Family points to two: Wis.Stat. § 101.22(2)(e), which forbids discrimination by casualty insurers on the basis of race, and Wis.Stat. § 628.34(3), which more generally interdicts “unfair discrimination” in the business of insurance. Although American Family insists that it is “of no importance” that “these statutes may not be inconsistent with the Fair Housing Act”, this is hard to swallow. Literalism cuts both ways. Cipollone v. Liggett Group, Inc., — U.S. —,—, 112 S.Ct. 2608, 2618, 120 L.Ed.2d 407 (1992) (a preemption clause should be taken seriously, but such a clause also implies the absence of additional grounds of preemption). Having stood on the text to show that the McCarran-Ferguson Act governs the construction of the Fair Housing Act, American Family needs to show that the Fair Housing Act conflicts with state law. Duplication is not conflict.
Undoubtedly there is a sense in which any overlap between state and federal law upsets a balance struck by one of the two legislatures. Gade v. National Solid Wastes Management Ass’n, — U.S. —, —-—, 112 S.Ct. 2374, 2385-86, 120 L.Ed.2d 73 (1992). Wisconsin forbids “unfair discrimination”.but, as we conclude in Part IV, did not create a private right of action to enforce this prohibition. Laws enforced only by administrative agencies with limited budgets are less potent than laws enforced by both agencies and private litigants. One could say that a federal rule increasing the probability that a state norm will be vindicated (or augmenting the damages assessed in the event of violation) conflicts with a decision by the state that remedies should be limited or rare. It is on reasoning ■ of this sort that the Supreme *296 Court does not allow states to forbid most conduct that is “arguably prohibited” by federal labor laws. San Diego Building Trades Council v. Garmon, 359 U.S. 236, 246, 79 S.Ct. 773, 780, 3 L.Ed.2d 775 (1959). Cf. Luddington v. Indiana Bell Telephone Co., 966 F.2d 225, 228-29 (7th Cir.1992).
Principles of labor law do not transfer to other subjects, however. Garmon and similar opinions rest on a conclusion that Congress occupied the field of labor relations, so that it remains only to decide which state laws regulate “labor relations” and which address broader subjects (such as criminal violence) that intersect with but do not displace federal rules. In the main, federal regulation of a subject — even thoroughgoing federal regulation — does not prevent states from adding remedies to the arsenal established by federal law. The McCarran-Ferguson Act is a form of inverse preemption, so principles defining when state remedies conflict with (and so are preempted by) federal law are pertinent in deciding when federal rules “invalidate, impair, or supersede” state rules.
Consider nuclear power. National law regulates almost every nook and cranny of industries handling radioactive materials. Yet the Court held in Silkwood v. Kerr-McGee Corp., 464 U.S. 238, 104 S.Ct. 615, 78 L.Ed.2d 443 (1984), that states may require firms engaged in this business to pay punitive damages for violating norms of state law duplicating those of federal law, even on the assumption that federal law sets a much lower cap on monetary liability. See also English v. General Electric Co., 496 U.S. 72, 88-89, 110 S.Ct. 2270, 2280-81, 110 L.Ed.2d 65 (1990). National law also regulates the competitive behavior of firms engaged in interstate commerce. The Court held in Illinois Brick Co. v. Illinois, 431 U.S. 720, 97 S.Ct. 2061, 52 L.Ed.2d 707 (1977), that indirect purchasers may not recover under the antitrust laws because such recoveries would unduly complicate litigation and undermine the deterrent force of those laws. Nonetheless, the Court unanimously held in California v. ARC America Corp., 490 U.S. 93, 109 S.Ct. 1661, 104 L.Ed.2d 86 (1989), that states may require offenders to pay damages to indirect purchasers, on top of the treble damages federal law requires them to pay to direct purchasers. Federal law regulates the advertising of cigarettes and expressly bars states from prescribing different or additional disclosures; nonetheless, states may award damages for fraud in selling this product. Cipollone, — U.S. at —-—, 112 S.Ct. at 2623-24. The catalog may be extended at will. E.g., Hillsborough County v. Automated Medical Laboratories, Inc., 471 U.S. 707, 105 S.Ct. 2371, 85 L.Ed.2d 714 (1985) (medical safety); Amanda Acquisition Corp. v. Universal Foods Corp., 877 F.2d 496, 502-05 (7th Cir.1989) (tender offers); Air Line Pilots Ass’n v. UAL Corp., 874 F.2d 439, 446-47 (7th Cir.1989) (interaction of labor and corporate law).
Considerations of this kind led the fourth circuit to hold in Mackey that application of the Fair Housing Act to insurance would not impair or supersede any state law, although North Carolina, like Wisconsin, forbids discriminatory rates in the insurance business. 724 F.2d at 421 nn. 1 & 2. (Mackey went on to hold that the Fair Housing Act does not apply to property insurance, a subject to which we return.) The only obstacle to joining that conclusion is our opinion in Lowe. After holding that the rule of construction in the McCarran-Ferguson Act applies to the Truth in Lending Act, and observing that Illinois required insurance brokers and premium finance companies to make the same disclosures as the Truth in Lending Act did, we wrapped up: “Since Illinois has regulated this aspect of the ‘business of insurance’ in the same manner as would the Truth in Lending Act, there is no compelling reason to restrict the full sway of the McCarran Act in this case.” 536 F.2d at 1162. Without further explanation, Lowe affirmed a judgment dismissing a suit filed under the Truth in Lending Act.
Lowe’s unstated premise is that a federal statute duplicating the terms of state law “invalidate[s], impairfs], or supersede^]” state law. Lowe did not explain why and cited no authority. This omission has opened Lowe to criticism by the fifth cir *297 cuit. Cochran v. Paco, Inc., 606 F.2d 460, 466 (5th Cir.1979). Cases such as Silk-wood and ARC America decided in the 16 years since Lowe show that state and federal rules that are substantively identical but differ in penalty do not conflict with or displace each other. To the extent Lowe holds the contrary, it is overruled.
Nothing in this conclusion permits federal law to displace states’ choices about the proper conduct of the business of insurance. If Wisconsin wants to authorize redlining, it need only say so; if it does, any challenge to that practice under the auspices of the Fair Housing Act becomes untenable. American Family has not drawn to our attention, however, any law, regulation, or decision in Wisconsin requiring redlining, condoning that practice, committing to insurers all decisions about redlining, or holding that redlining with discriminatory intent (or disparate impact) does not violate state law. Cf. FTC v. Ticor Title Insurance Co., — U.S. —, 112 S.Ct. 2169, 119 L.Ed.2d 410 (1992). No official of Wisconsin has appeared in this litigation to say that a federal remedy under the Fair Housing Act would frustrate any state policy. Although the McCarranFerguson Act gives states the final word on the regulation of insurance unless Congress specifically overrides their choices, Wisconsin’s word is consistent with the Fair Housing Act.
Ill
According to the plaintiffs, three sections of the Fair Housing Act address insurance sold (or withheld) in connection with the purchase of a dwelling: 42 U.S.C. §§ 3604(a), 3604(b), and 3605. Section 3605 requires the least discussion. It provides:
(a) It shall be unlawful for any person or other entity whose business includes engaging in residential real estate-related transactions to discriminate against any person in making available such a transaction, or in the terms or conditions of such a transaction, because of race, col- or, religion, sex, handicap, familial status, or national origin.
(b) As used in this section, the term “residential real estate-related transaction” means any of the following:
(1) The making or purchasing of loans or providing other financial assistance—
(A) for purchasing, constructing, improving, repairing, or maintaining a dwelling; or
(B) secured by residential real estate.
(2) The selling, brokering, or appraising of residential real property."
It would strain language past the breaking point to treat property or casualty insurance as “financial assistance” — let alone as assistance “for purchasing ... a dwelling”. Insurers do not subsidize their customers or act as channels through which public agencies extend subsidies. They do not “assist” customers even in the colloquial sense that loans are “assistance” (a lender advances cash, with repayment deferred). Payment runs from the customer to the insurer. Insurance is no more “financial assistance” than a loaf of bread purchased at retail price in a supermarket is “food assistance” or a bottle of aspirin bought from a druggist is “medical assistance.”
Section 3604 makes it unlawful:
(a) To refuse to sell or rent after the making of a bona fide offer, or to refuse to negotiate for the sale or rental of, or otherwise make unavailable or deny, a dwelling to any person because of race, color, religion, sex, familial status, or national origin.
(b) To discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection therewith, because of race, col- or, sex, familial status, or national origin.
Plaintiffs rely on the portions of these sections that we have italicized. They contend that by refusing to write policies (or setting a price too dear) an insurer “make[s a dwelling] unavailable” to the potential buyer. Lenders require their borrowers to secure property insurance. No insurance, no loan; no loan, no house; lack of insurance thus makes housing unavailable. Cf. Cart *298 wright v. American Savings & Loan Ass’n, 880 F.2d 912 (7th Cir.1989). Plaintiffs also submit that property insurance is a “service” rendered “in connection” with the sale of the dwelling. If the world of commerce is divided between “goods” and “services,” then insurers supply a “service.” “[I]n connection” may be read broadly, and should be (plaintiffs contend) to carry out the national goal of removing obstacles to minorities’ ownership of housing. There you have it.
Nothing in the text of the statute permits us to reject these proposed readings. The Fair Housing Act does not define key terms such as “service” and “make unavailable”. By writing its statute in the passive voice — banning an outcome while not saying who the actor is, or how such actors bring about the forbidden consequence — Congress created ambiguity.
Although § 3604 could bear the reading plaintiffs propose, it need not. It does not mention insurers or forbidden devices. Plaintiffs would like us to embrace the “remedial purpose” of the statute. Title VIII indeed is designed to root out racial discrimination in the housing market. Whether it reaches insurers, however, is not something a general reference to purpose discloses. One can always do “more” in pursuit of a goal, but statutes have limits. You cannot discover how far a statute goes by observing the direction in which it points. “Finding the meaning of a statute is more like calculating a vector (with direction and length) than it is like identifying which way the underlying ‘values’ or ‘purposes’ point (which has direction alone). Cf. Walton v. United States Consumers Club, Inc., 786 F.2d 303, 310-11 (7th Cir.1986); Mercado v. Calumet Federal Savings & Loan Ass’n, 763 F.2d 269, 271 (7th Cir.1985).” In re Erickson, 815 F.2d 1090, 1094 (7th Cir.1987). See also Rodriguez v. United States, 480 U.S. 522, 525-26, 107 S.Ct. 1391, 1393, 94 L.Ed.2d 533 (1987).
After denying that “remedial purpose” alone extends the statute to insurance, the fourth circuit in Mackey gave several reasons why it believed that § 3604 does not apply. The first is that § 3605 shows that § 3604 must be read narrowly. “If § 804 [§ 3604] was designed to reach every discriminatory act that might conceivably affect the availability of housing, § 805’s specific prohibition of discrimination in the provision of financing would have been superfluous.” 724 F.2d at 423. The court’s unstated assumption is that statutes never overlap. Section 3605 then shows that § 3604 does not cover lending, and by implication does not cover much at all. Yet why should we suppose that sections of a statute do not overlap? See United States v. Naftalin, 441 U.S. 768, 778, 99 S.Ct. 2077, 2084, 60 L.Ed.2d 624 (1979) (“that there may be some overlap is neither unusual nor unfortunate.”). Conveying meaning to diverse interpreters for an uncertain future is a difficult business. A wise drafter may state a principle in one section and list some applications of that principle in another, to make pellucid what ought to be apparent but which some judges (and many lay persons) will miss unless spelled out. Using the instance to restrict the principle would gum up the process of communication, inverting every effort to clarify.
As a second reason for treating § 3604 as inapplicable to insurance, Mackey observed that “[t]he insurance industry has traditionally classified risks. If insurance premiums are to remain at reasonable levels for most householders, some insurers must be permitted to reject risks which are perceived to be excessively high, while charging higher premiums on some risks than upon others.” 724 F.2d at 423. If the question were whether to subject redlining by insurers to evaluation under the disparate impact paradigm, this consideration might be important. As we suggested at the outset, classification of risks is important to insurance, and assigning higher rates to greater risks differs from assigning rates by race. Nothing in the nature of insurance implies that hazard insurers need to engage in disparate treatment, to draw lines on the basis of race rather than risk. The fourth circuit could have said much the same thing about lenders as it said about insurers. A lender must evaluate the risk *299 that the borrower will not repay, and higher probability of nonpayment implies a higher rate of interest (or a lower probability of extending credit). Title VIII indisputably applies to lenders, and it is difficult to see risk classification as a principled ground to exclude insurers.
Mackey also stressed the omission from both § 3604 and its legislative history of any reference to insurance. Because § 3604 uses the passive voice, however, it omits reference to any person. Insurers, escrow agents, title searchers, and so on are treated alike. The fourth circuit ultimately concluded that “service” in § 3604 means no more than “garbage collection and other services of the kind usually provided by municipalities”, 724 F.2d at .424, but Congress did not mention either garbage collectors or municipalities in § 3604. Selective omission might be telling, but the universal omission that accompanies passive construction does not distinguish insurers from others. We once suggested in passing, Southend Neighborhood Improvement Ass’n v. County of St. Clair, 743 F.2d 1207, 1210 (7th Cir.1984), that “service” in § 3604 means “services generally provided by governmental units,” but the subject was not before us — and the suggestion that § 3604 is limited to governments is hard to reconcile with another plain-statement principle requiring Congress to be especially clear if it wants to regulate the conduct of state and local governments. E.g., Gregory v. Ashcroft, — U.S. —,—-—, 111 S.Ct. 2395, 2399-2406, 115 L.Ed.2d 410 (1991); Dellmuth v. Muth, 491 U.S. 223, 109 S.Ct. 2397, 105 L.Ed.2d 181 (1989). A statute that does not mention state governments applies exclusively to private actors. So it is hard to understand § 3604 as restricted to garbage collection and like services. See also Clifton Terrace Associates, Ltd. v. United Technologies Corp., 929 F.2d 714 (D.C.Cir. 1991) (“service” in § 3604 means services in connection with the acquisition of housing, not its maintenance; § 3604 therefore does not apply to elevator repair services).
Silence in the legislative history could imply that Members of Congress did not anticipate that the law would apply to insurers. Silence equally could imply that the debate was about the principle of nondiscrimination, leaving details to the future. The backward phraseology of § 3604 suggests the latter possibility. What was in the heads of the legislators is not, however, the measure of their enactment. Only the statute, and not the debates, is part of the United States Code. Persuasive evidence that Congress embedded terms of art in the text might lead us to confine its scope, Continental Can Co. v. Chicago Truck Drivers Pension Fund, 916 F.2d 1154 (7th Cir.1990), but what did not happen during the debates hardly shows that any word in the enacted text carries a special meaning.
In 1980 the silence was broken. A district court concluded that the Fair Housing Act covers property insurers. Dunn v. Midwestern Indemnity Mid-American Fire & Casualty Co., 472 F.Supp. 1106 (S.D.Ohio 1979). Some Members of Congress sought to amend Title VIII to “clarify” that Dunn correctly understood its scope. The effort was beaten back. See Mackey, 724 F.2d at 423-24 (summarizing these events). The fourth circuit inferred that Congress disapproved of Dunn. That conclusion is unwarranted. Proposed legislation can fail for many reasons. Some Members of Congress may oppose the proposal on the merits; others may think it unnecessary and therefore not worth the political capital needed to write the “clarification” into the statute over opposition; still others may be indifferent, or seek to use the bill as a vehicle for some unrelated change. Congress may run out of time, as a noncontroversial bill sits in a queue while a contentious proposal is debated. No surprise, therefore, that the Supreme Court repeatedly reminds us that unsuccessful proposals to amend a law, in the years following its passage, carry no significance. E.g., Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 114, 109 S.Ct. 948, 956, 103 L.Ed.2d 80 (1989). See also United States v. Marshall, 908 F.2d 1312, 1318-19 (7th Cir.1990) (in banc), affirmed under the name Chapman v. United States, — U.S. —, — n. 4, 111 S.Ct. 1919, 1927 n. *300 4, 114 L.Ed.2d 524 (1991). Were it otherwise, one House of Congress could change the meaning of a law by refusing to approve a change in the text. Yet Congress may change the law only by bicameral action, INS v. Chadha, 462 U.S. 919, 103 S.Ct. 2764, 77 L.Ed.2d 317 (1983), which implies that the refusal of one chamber to assent to a proposed amendment cannot alter the meaning of the law on which both chambers agreed in prior years.
By parallel reasoning, we dispatch American Family’s argument that legislative failure to overturn Mackey is significant. Interest groups alert Congress to many judicial decisions, and the legislature frequently alters the law to countermand opinions that do not find favor in today’s political climate. During the last quarter century, Congress has interred an average of 15 opinions per year, about two-thirds of these opinions by the inferior courts. William N. Eskridge, Jr., Overriding Supreme Court Statutory Interpretation Decisions, 101 Yale L.J. 331, 338 (1991). Courts of appeals and district courts issue tens of thousands of opinions yearly, however, so an opinion has to stir up a hornets’ nest to get on the agenda. Most of the time, Congress waits to see whether a higher court will reach a different conclusion. Mackey appeared on the agenda, but some Members of Congress opposed the proposal to change Title VIII. Members of Congress expressed conflicting views, but Congress as an institution took a pass. That decision carries no significance.
Congress has not been inactive since Mackey, however. In 1988 it enacted amendments to the Fair Housing Act, authorizing the Department of Housing and Urban Development to “make rules ... to carry out this subchapter.” 42 U.S.C. § 3614a. Congress gave the Executive Branch this power with knowledge that since 1978 a succession of Secretaries have believed that “[ijnsurance redlining, by denying or impeding coverage[,] makes mortgage money unavailable,, rendering dwellings ‘unavailable’ as effectively as the denial of financial assistance on other grounds”. Memorandum by the General Counsel of HUD, quoted in Dunn, 472 F.Supp. at 1109. The Secretary deployed this new rulemaking power in the predictable way, issuing regulations that include, among the conduct prohibited by § 3604: “Refusing to provide ... property or hazard insurance for dwellings or providing such ... insurance differently because of race”. 24 C.F.R. § 100.70(d)(4). The United States has filed a brief as amicus curiae to support the plaintiffs’ position in this case.
Section 3604 is sufficiently pliable that its text can bear the Secretary’s construction. Courts should respect a plausible construction by an agency to which Congress has delegated the power to make substantive rules. Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984); Pauley v. Bethenergy Mines, Inc., — U.S. —, —-—, 111 S.Ct. 2524, 2534-36, 115 L.Ed.2d 604 (1991). We can imagine the response that courts do not defer to administrative constructions when judges, rather than administrators, hold the power of enforcement. Adams Fruit Co. v. Barrett, 494 U.S. 638, 649-50, 110 S.Ct. 1384, 1390-91, 108 L.Ed.2d 585 (1990). Just as Congress authorized private litigation to enforce the Migrant and Seasonal Agricultural Worker Protection Act, the subject of Adams Fruit, so the Fair Housing Act is enforced by the courts at the instance of private persons believing themselves wronged.
Among the amendments in 1988, however, was a provision for administrative enforcement paralleling judicial enforcement. 42 U.S.C. §§ 3610-12. The Secretary’s regulations would receive deference in an action to enforce HUD’s administrative decision. It would be weird to say that Title VIII applies to insurers on judicial review of administrative actions but not when the litigation begins in district court. Long before Adams Fruit, indeed long before the Secretary had the power to issue regulations and adjudicate complaints under Title VIII, the Supreme Court declared that the Secretary’s views about the meaning of that statute are entitled to “great weight”. *301 Trafficante v. Metropolitan Life Insurance Co., 409 U.S. 205, 210, 93 S.Ct. 364, 367, 34 L.Ed.2d 415 (1972); Gladstone, 441 U.S. at 107, 99 S.Ct. at 1611.
Events have bypassed Mackey. We have expressed doubt about the interpretive methods used in that opinion. No matter how a court should have understood the Fair Housing Act in 1984, however, the question today is whether the Secretary’s regulations are tenable. They are. Section 3604 applies to discriminatory denials of insurance, and discriminatory pricing, that effectively preclude ownership of housing because of the race of the applicant.
IV
Plaintiffs contend that redlining violates state law in two ways. First, they believe, redlining entails racial discrimination forbidden by Wis.Stat. § 101.22(2)(e). Second, they contend, redlining is an “unfair” practice that offends several provisions of the Insurance Code. American Family concedes that plaintiffs are entitled to enforce § 101.22(2)(e) in private litigation but denies that statutes and regulations speaking more generally about “unfair” practices create private rights of action. The district court agreed with this submission and dismissed the complaint to the extent it relied on Wis.Stat. §§ 625.-11(1) and 628.34(3), and Wis.Adm.Code INS 6.68. Our review is plenary. Salve Regina College v. Russell, — U.S. —, 111 S.Ct. 1217, 113 L.Ed.2d 190 (1991).
Section 625.11(1) forbids “unfair discrimination” in the setting of rates but does not specify what unfair discrimination consists in. Section 628.34(3) bans differentials in premiums and coverages unless based on “classifications related to the nature and the degree of the risk covered and the expenses involved”. Regulation INS 6.68 adds a bit of specificity to these open-ended statutes. Plaintiffs rely particularly on INS 6.68(3)(a), which identifies the following as “unfairly discriminatory” for purposes of the insurance statutes:
Making or permitting any unfair discrimination between individuals or risks of the same class and of essentially the same hazards by refusing to issue, refusing to renew, canceling or limiting the amount of insurance coverage on a property or casualty risk because of the geographic location of the risk, unless:
1. The refusal, cancellation or limitation is for a business purpose which is not a mere pretext for unfair discrimination, or
2. The refusal, cancellation or limitation is required by law or regulatory mandate.
Redlining is a distinction based on the “geographic location of the risk” and hence unlawful in Wisconsin as “unfairly discriminatory” unless “for a business purpose which is not a mere pretext for unfair discrimination”.
Neither of these statutes, nor regulation INS 6.68, specifies private litigation or provides a remedy in damages. Each regulates general business practices and leaves much to the discretion of whoever must determine what is “unfair” or “for a business purpose”. Like charges to a federal agency to identify the “public interest, convenience, and necessity,” these rules read more like descriptions of an agency’s turf than like individual rights to be enforced in litigation.
No court of Wisconsin has permitted anyone to enforce provisions of this kind in the insurance laws through private litigation. Plaintiffs observe that many state cases say that a remedy accompanies every right, e.g., Urwan v. Northwestern National Life Insurance Co., 125 Wis. 349, 103 N.W. 1102 (1905), and that Yanta v. Montgomery Ward & Co., 66 Wis.2d 53, 224 N.W.2d 389 (1974), allowed a victim of employment discrimination to obtain a remedy, back pay, not mentioned in the statute creating the right of action. Our concern, though, is not whether there is some remedy for violations of state law — for Wisconsin maintains a substantial administrative apparatus regulating the conduct of insurers — or whether the statutes provide one measure of damages rather than another. It is whether courts, rather than the regulators, are the right institutions to identify *302 “unfair discrimination” and “business purpose” in this market.
Kranzush v. Badger State Mutual Casualty Co., 103 Wis.2d 56, 307 N.W.2d 256, 268-70 (1981), persuades us that Wisconsin wants such contentions submitted to administrators rather than judges. Kranzush complained that, even though its insured obviously was negligent and had to compensate the victim of an auto accident, an insurance company stalled until the victim died; such manipulation, the administrator of the estate contended, violated Wis.Adm. Code INS 6.11(3)(a)4, which makes it an “unfair practice” for an insurer to fail “to attempt in good faith to effectuate fair and equitable settlement of claims submitted in which liability has become reasonably clear.” The Supreme Court of Wisconsin held that enforcement of administrative rules defining unfair practices is for administrative officials, which can revoke an insurer’s license or impose other penalties. Wis.Stat. § 601.64(3)(c) and (4) set out penalties for transgressions against insurance statutes and rules; damages in private actions are not among them. Although Kranzush mentioned that a separate provision for administrative remedies in INS 6.11 fortified the conclusion that the administrative route was exclusive, 103 Wis.2d at 80, 307 N.W.2d at 268, the court also emphasized that the rule defined unfair practices, a subject the justices thought best handled by the Commissioner of Insurance and the staff of that office.
Perhaps the Supreme Court of Wisconsin ultimately will conclude that the specification of an administrative remedy in INS 6.11 distinguishes that section from INS 6.68. Extensions of state law are best left to state courts. This is a case about racial discrimination, and plaintiffs will have ample opportunity to prove their claims under both state and federal law.
V
Because this opinion overrules Lowe to the extent that Lowe holds that the McCar-ran-Ferguson Act prevents the application of federal laws duplicating state rules, and because it conflicts with both the second circuit’s views in Spirt and the fourth circuit’s holding in Mackey, it was circulated before release to all judges in active service. See Circuit Rule 40(f). No judge requested a hearing in banc.
The judgment of the district court is affirmed to the extent it holds that there is no private right of action to enforce Wis. Stat. §§ 625.11(1) and 628.34(3), and Wis. Adm.Code INS 6.68. The judgment is reversed to the extent it holds that the Fair Housing Act is inapplicable to property and casualty insurance written or withheld in connection with the purchase of real estate. The case is remanded for proceedings consistent with this opinion.